UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WNAC, LLC, | * <br> * <br> * |
| Plaintiff, | * <br> * |
| v. | * <br> * |
| VERIZON CORPORATE SERVICES GROUP, INC. and NEXSTAR MEDIA GROUP, INC., | * Civil Action No. 21-cv-10750-ADB <br> * <br> * <br> * |
| Defendants. | * <br> * <br> * |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

BURROUGHS, D.J.

Plaintiff WNAC, LLC ("WNAC") alleges that Verizon Corporate Services Group, Inc. ("Verizon") and Nexstar Media Group, Inc. ("Nexstar," together "Defendants") conspired to wrongfully retransmit the signal from WNAC's television broadcast station, WNAC-TV, in violation of the Copyright Act. WNAC also brings state statutory and common law claims related to the contract executed between Defendants that led to the alleged copyright infringement. Currently before the Court are Defendants' motions to dismiss the state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motions, [ECF Nos. 44, 46], are GRANTED in part and DENIED in part.

**I.  BACKGROUND**

The following facts are taken primarily from the amended complaint, [ECF No. 40 ("Am. Compl.")], the factual allegations of which are assumed to be true when considering a motion to dismiss, Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014). As it may on a

motion to dismiss, the Court may also consider "documents incorporated by reference in [the amended complaint], matters of public record, and other matters susceptible to judicial notice." Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003).

### A. Factual Background

WNAC owns WNAC-TV, a local station that broadcasts television programming provided by other broadcasting companies in the Providence, Rhode Island–New Bedford, Massachusetts Designated Market Area ("DMA"). [Am. Compl. ¶ 22]. Nexstar is one of the broadcasting companies that provided programming content to WNAC. [Id. ¶¶ 22, 26]. Verizon is a multichannel video programming distributor ("MVPD"), essentially a cable operator, that provides American households with access to various video channels that serve a particular household's DMA, including local broadcast stations like WNAC-TV. [Id. ¶¶ 16, 38].

Under the Communications Act of 1934, MVPDs like Verizon are required to obtain a broadcast station's consent to retransmit a station's signal. [Am. Compl. ¶ 18]. Retransmission consent can be granted through an agreement between a broadcast station and an MVPD. [Id. ¶ 20]. These agreements often require the MVPD to pay the broadcast station a monthly fee per subscriber in exchange for the right to retransmit the signal. [Id.]. Generally, retransmission consent agreements can be negotiated by a MVPD and a broadcast station directly, or between a MVPD and a third party that acts on the broadcast station's behalf with the broadcast station's consent. [Id. ¶¶ 19–21].

WNAC has expressly permitted third parties to negotiate with MVPDs on its behalf to obtain retransmission consent agreements. [Am. Compl. ¶¶ 23–24]. Dating back to 1996, WNAC had a Joint Marketing and Programming Agreement, known as a local management

agreement ("LMA"), with LIN Television Corporation ("LIN"). [Id. ¶¶ 22–23]. Under the LMA, LIN operated, or at least "played a substantial role" in operating, WNAC-TV and, as a result, it negotiated the station's retransmission consent rights. [Id. ¶ 23]. In December 2014, LIN merged with a company called Media General, which became a party to the LMA and inherited those rights. [Id.]. In early 2015, the newly merged entity negotiated on WNAC's behalf, and with its consent, a retransmission consent agreement with Verizon that lasted from February 2015 to August 2017. [Id. ¶ 24]. Then, in January 2017, Media General merged with another company, Nexstar, which made Nexstar a party to the LMA. [Id. ¶ 25]. Since the January 2017 merger, Nexstar "has played a substantial role in the [WNAC-TV's] operations under the LMA." [Id. ¶ 27].

Prior to the January 2017 merger with Media General—in other words, prior to its acquisition of WNAC-TV—on December 31, 2016, Nexstar executed a retransmission consent agreement with Verizon, with a term of January 1, 2017 to December 31, 2019 ("2017 Agreement" or "the Agreement"). [Am. Compl. ¶ 31]. Section 15 of the 2017 Agreement, the "after-acquired station provision," states that

> In the event that Nexstar . . . becomes the direct or indirect owner, operator, licensee, programmer, or manager of any additional television broadcast station that is located in the same Television Market as, or that is carried by, a [Verizon system] after the date of this Agreement, such additional station . . . will become part of this Agreement, under the same terms and conditions . . . for the remainder of the Term[.]

[ECF No. 47-1 at 13 § 15].

The 2017 Agreement also provides that

> As consideration for [Verizon's] right to distribute the Program Transport Streams, [Verizon] will pay to Nexstar at the address set forth in Section 12, on behalf of the Licensees, on a monthly basis, no later than forty-five (45) days after the end of each month, a fee ("Fee") for each Subscriber of a System.

3

[ECF No. 47-1 at 24]. The Agreement defined "Licensees" as "collectively, Nexstar, any subsidiary of Nexstar or any entity or person that becomes a party to this Agreement pursuant to [the 'after-acquired station' provision] that holds a television broadcast authorization issued by the FCC[.]" [Id. at 2].

Importantly, Nexstar also owns and operates another local broadcast station in the same DMA as WNAC-TV, WPRI-TV. [Am. Compl. ¶ 28]. WNAC highlights this particular fact because, as of April 2015, federal law prohibits "joint or coordinated" retransmission consent negotiations between MVPDs and two or more television broadcast stations in the same local market "unless such stations are directly or indirectly under common *de jure* control permitted under the regulations of the Commission." [Id. ¶ 21]; 47 U.S.C. §§ 325(b)(1)(A), (b)(3)(C)(iv); 47 C.F.R. § 76.65(b)(1)(viii). This change, according to WNAC, prohibited Nexstar from negotiating retransmission consent rights on WNAC's behalf after the new rule was promulgated in 2015. [Am. Compl. ¶ 30].

Nevertheless, pursuant to the 2017 Agreement between Verizon and Nexstar, Verizon retransmitted WNAC-TV's signal from January 1, 2017 to December 31, 2019, and paid Nexstar for those transmissions. [Am. Compl. ¶¶ 30–31, 44].[1] WNAC did not participate in negotiations for the 2017 Agreement, was not a party to the 2017 Agreement, never expressly consented to Verizon's retransmission of the WNAC-TV's signal for the 2017–2019 period, and did not itself execute any other retransmission consent agreement with Verizon directly for 2017–2019 period. [Id. ¶¶ 30, 33]. WNAC contends that Nexstar did not have a right to negotiate or grant WNAC's transmission rights for the 2017 Agreement because those negotiations post-dated the 2015 rule

---

[1] After WNAC filed the instant suit, Nexstar returned to Verizon the payments it received for any WNAC-TV retransmissions from 2017 to 2019. [Am. Compl. ¶ 102]. Verizon "did not request the refund and disagrees it was necessary." [ECF No. 47 at 13 n.6].

change, [id. ¶ 32], and that Nexstar improperly provided the access that allowed Verizon to retransmit the WNAC-TV's signal during this time "by making the signal available (likely via a fiber optic cable connected to Verizon's headend control center or other technical means)[,]" [id. ¶¶ 46–47, 72].[2] WNAC did not receive any payments from Verizon or Nexstar for that period. [Id. ¶ 46].

In and around November 2019, prior to the expiration of the 2017 Agreement, Verizon and Nexstar approached WNAC to negotiate a retransmission consent agreement for the 2020–2022 period. [Am. Compl. ¶ 53]. This is when WNAC first learned that Verizon had retransmitted WNAC's signal in the 2017–2019 period. [Id. ¶ 53]. WNAC claims that, in response to its inquiries about the 2017–2019 retransmissions, Verizon and Nexstar purposefully withheld information to mislead WNAC about the ongoing unlawful retransmissions. [Id. ¶¶ 72–73, 100]. WNAC did not see the 2017 Agreement until Nexstar turned it over at WNAC's request in December 2019. [Id. ¶ 56]. The complaint alleges that Nexstar initially represented to WNAC that Verizon's 2017–2019 retransmissions under the Agreement were lawful, but later "expressly admitted to WNAC in writing that Nexstar could not lawfully have negotiated or granted the retransmission consent for the Station's signal on WNAC's behalf in the 2017 Agreement." [Id. ¶ 57].

In 2020, WNAC executed a retransmission consent agreement directly with Verizon for the 2020–2022 period. [Am. Compl. ¶ 37].

---

[2] Verizon retransmits programming, at least in part, through a fiber optic system Verizon Fios. [Am. Compl. ¶ 38].

### B.     Procedural Background

WNAC filed the instant suit on May 6, 2021, alleging that Verizon and Nexstar colluded to unlawfully transmit WNAC-TV's signal without WNAC's required consent and without compensating WNAC. [ECF No. 1]. WNAC's operative complaint, filed on February 10, 2022, asserts counts of direct copyright infringement against Verizon (Count I) and contributory and vicarious copyright infringement against Nexstar (Counts II and III, respectively). [Am. Compl. ¶¶ 75–91]. Additionally, WNAC asserts four state statutory and common law counts against Defendants: violation of Mass. Gen. Laws. ch. 93A, § 11 (Count IV), conversion (Count V), breach of the 2017 Agreement (Count VI), and unjust enrichment (Count VII). [Id. ¶¶ 92–127].

On March 4, 2022, Defendants separately moved to dismiss the state law claims, Counts IV–VII. [ECF Nos. 44, 46]. Oppositions, replies, and sur-replies have been filed. [ECF Nos. 49, 50, 53, 54, 57, 58].

## II.    LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pled facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Id. at 570. "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw

on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

### III.   DISCUSSION

Defendants contend that the Chapter 93A, conversion, and unjust enrichment counts are duplicative of the copyright counts and are therefore preempted by federal copyright law. [ECF No. 45 at 14–21 (Nexstar); ECF No. 47 at 16–22 (Verizon)]. Defendants also argue that the breach of contract claim, pled by WNAC in the alternative, fails on its merits. [ECF No. 45 at 23–25; ECF No. 47 at 24–26].

#### A.   Preemption

"Federal copyright law preempts rights under state law when they are the equivalent of those granted under the Copyright Act." John G. Danielson, Inc. v. Winchester–Conant Properties, Inc., 322 F.3d 26, 44 (1st Cir. 2003); see 17 U.S.C. § 301(a) ("[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright . . . are governed exclusively by this title.").

For the purposes of the preemption inquiry, claims are equivalent "if 1) the work involved falls within the subject matter of copyright and 2) the state law claim incorporates no extra element that is qualitatively different from the copyright claim." Steele v. Turner Broad. Sys., Inc., 607 F. Supp. 2d 258, 263 (D. Mass. 2009) (citation and internal quotation marks omitted); see also Feldman v. Twentieth Century Fox Film Corp., 723 F. Supp. 2d 357, 368 (D. Mass. 2010).  In other words, the extra element must be more than "mere copying, preparation of derivative works, performance, distribution or display[.]" Tingley Sys., Inc. v. CSC Consulting, Inc., 152 F. Supp. 2d 95, 104–05 (D. Mass. 2001).  A court's analysis of whether there exists an extra element that differentiates the nature of the action from a copyright claim is "functional and fact-specific." Real View, LLC v. 20-20 Techs., Inc., 789 F. Supp. 2d 268, 273 (D. Mass. 2011).  Elements that "merely alter the scope of the action and not its nature" such as "awareness, intent or commercial misconduct" cannot save the claim from preemption, neither does an allegation of "failure to obtain permission for use or continued use." Tingley Sys., 152 F. Supp. 2d at 105 (quoting Rubin v. Brooks/Cole Pub. Co., 836 F.Supp. 909, 923–24 (D. Mass. 1993)).

      i.      Chapter 93A (Count IV)

Courts in this district typically hold unfair competition claims, when based on the same allegations as a copyright claim, to be preempted, Feldman, 723 F. Supp. 2d at 368; Tingley Sys., 152 F. Supp. 2d at 108, but Chapter 93A claims can evade preemption if they allege the "use of unethical means to *access* another's copyrighted work[,]" Real View, 789 F. Supp. 2d at 274.  For example, in Real View, the court proposed that claims that a defendant "hacked" into a plaintiff's website to illegally download copyrighted videos set a Chapter 93A claim apart from a copyright claim.  789 F. Supp. 2d at 274.  In Timmins Software Corp. v. EMC Corp., 502 F. Supp. 3d 595 (D. Mass. 2020), the extra element was that defendants "improperly pressured

[plaintiff] to agree to unreasonable contract terms, used knowingly false accusations and leveraged the parties' unequal bargaining power to force [plaintiff] to agree to an extension of the parties' agreement and then used that extension to buy time and retain access to the [] platform" containing the copyrighted materials.  Timmins at 602; see also InSync Training, LLC v. Am. Soc'y for Training & Dev., Inc., No. 21-cv-0594, 2022 WL 1105065, at *10 (D.N.H. Apr. 13, 2022) (allegation that defendant remained in a license agreement under false pretenses only to retain access to copyrighted materials was "extra element" that altered the nature of the claim).

By contrast, "labeling conduct commercially immoral or, as under Chapter 93A, unfair, immoral, unethical or unscrupulous, does not save a Chapter 93A claim from preemption[,]" Tingley Sys., 152 F. Supp. 2d at 108, and nor do allegations that a defendant engaged in "techniques to conceal" its infringement, President & Fellows of Harvard Coll. v. Certplex, Ltd., No. 15-cv-11747, 2015 WL 10433612, at *3 (D. Mass. Nov. 25, 2015); see also Sybersound Recs., Inc. v. UAV Corp., No. 05-cv-5861, 2005 WL 8156567, at *6 (C.D. Cal. Nov. 7, 2005) (an allegation of failure to disclose the infringing nature of records, without more, is "nothing more than the infringement itself . . . not an 'extra element' that changes the nature of this claim").

WNAC attempts to survive preemption by arguing that Nexstar "used unethical means" to provide Verizon with access to the signal via broadcast equipment, [ECF No. 49 at 14; Am. Compl. ¶¶ 47–48, 95–97], but Nexstar's access to the equipment was not deceptive or even unlawful.  WNAC is not alleging that Defendants broke into WNAC-TV's studios or "hacked" into its networks.  As WNAC admits, Nexstar gained the right to control the equipment and grant MVPDs access to it when it became a party to the LMA.  [ECF No. 49 at 8; Am. Compl. ¶¶ 23–

9

25]. At most, WNAC's allegations are more akin to an illegal download, which courts have held to be preempted because such claims are not different in nature from copyright claims. Certplex, 2015 WL 10433612, at *2; Real View, 789 F.Supp.2d at 276.

Moreover, despite WNAC's contentions, allegations that Defendants failed to disclose their conduct or concealed it via misrepresentations, [Am. Comp. ¶¶ 98–99], do not amount to the extra element needed to save their claim from preemption, see e.g., Certplex, 2015 WL 10433612 at *3, nor does their continued retransmission of the signal without permission, [Am. Comp. ¶ 100], see e.g., Rubin, 836 F.Supp. 909, 923–24.

WNAC additionally asserts that Patricia Kennedy supports the contention that "failing to pay for access to the copyrighted material may also qualify as the 'extra element[,]'" [ECF No. 49 at 13], but this wrong for two reasons. One, it misquotes the pertinent portion of the opinion, which said that acquiring copyrighted work without payment by "disputing the origination of the []work[,]" *i.e.* by passing it off as one's own, was unfair or deceptive. Patricia Kennedy, 830 F. Supp. at 57. [3]  Two, if a failure to pay was the only extra element needed to allege an unfair or

---

[3] An unfair trade practices claim may evade preemption if accompanied by an allegation of "improper representation of permission" in which the defendant is "passing off" the plaintiff's product as its own. Rubin, 836 F. Supp. 909 at 924 (holding that Chapter 93A claim was preempted by federal copyright law to the extent it was based on the reproduction of the copyrighted work in defendants' book without permission and its continued use over plaintiff's objection, but not preempted to the extent it was based on defendant's actual statement in the book that the work was "reprinted with permission"). Had WNAC alleged that Nexstar knowingly and expressly misrepresented that it had WNAC's permission to negotiate on its behalf to induce Verizon into agreement, a Chapter 93A claim against Nexstar might have been viable. But that is not what WNAC has alleged. The thrust of its claim is that Defendants acted in cahoots to infringe its rights. See [Am. Compl. ¶ 67 ("Fully aware of WNAC's rights in its signal and of the federal laws controlling secondary retransmission in a local broadcast station's DMA, Defendants acted knowingly, willfully, with reckless disregard of those rights and laws, and in bad faith."); ¶ 94 ("Verizon and Nexstar colluded to retransmit WNAC's signal in 2017-2019 without WNAC's required consent.")].

deceptive practice beyond the protections of a copyright claim, federal copyright law's preemption of Chapter 93A cases would effectively be eliminated.

Accordingly, because WNAC has failed to allege any facts that suggest that this claim seeks to protect anything other than what the Copyright Act already protects, the Chapter 93A claim is preempted.

        ii.        Unjust Enrichment (Count VII)

WNAC's unjust enrichment claim, which is identical to its copyright infringement claims, is also preempted. [Am. Compl. ¶¶ 122–24]. Although WNAC seems to contend that the unjust enrichment claim is qualitatively different from its copyright claim because it includes an extra element "sounding in contract, an implied promise, or an expectation of compensation[,]" [ECF No. 50 at 19; ECF No. 49 at 18], Massachusetts law is clear that "[a] state cause of action for unjust enrichment or quasi contract should be regarded as an 'equivalent right' and hence preempted insofar as it applies to copyright subject matter[,]" Tingley Sys., at 112 (quoting 1 Nimmer on Copyright § 1.01[B][g] (1994)). Put simply, the Copyright Act is preemptive because this is an equitable claim that hinges on WNAC holding a copyright to the material, without which there would be no allegation that Defendants were enriched unjustly. Meddaugh v. WGBH Educ. Found., 31 Mass. L. Rptr. 264, 2013 WL 3477558 at *2 (Mass. Super. Ct. June 19, 2013). Moreover, this claim fails with or without preemption because WNAC has an adequate remedy at law in the form of its copyright claims. Bettencourt v. Jeanne D'Arc Credit Union, 370 F. Supp. 3d 258, 265 (D. Mass. 2019) ("The availability of an adequate remedy at law, even if ultimately unviable, precludes a claim for unjust enrichment." (citing Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017))).

### B. Conversion (Count V)

"Conversion is the wrongful exercise of ownership, control and dominion over the property of another." Wollaston Indus., LLC v. Ciccone, No. 19-cv-10678, 2019 WL 6841987, at *2 (D. Mass. Dec. 16, 2019) (citing Struzziero v. Lifetouch Nat. School Studios, Inc., 677 F. Supp. 2d 350, 354 (D. Mass. 2009)). To state a claim, "[a] plaintiff must show that (1) the defendant intentionally and wrongfully exercised control over property owned or possessed by the plaintiff, (2) the plaintiff was damaged and (3) if the defendant legitimately gained possession under a good-faith claim of right, the plaintiff's demand for the return of the property was refused." Children's Hosp. Corp. v. Cakir, 183 F. Supp. 3d 242, 245 (D. Mass. 2016).

It is settled that common law conversion claims are preempted by the Copyright Act where plaintiffs seek only to protect their rights of distribution, performance, and display. Henry v. Nat'l Geographic Soc'y, 147 F. Supp. 2d 16, 21 (D. Mass. 2001); Patricia Kennedy, 830 F. Supp. at 56. To skirt this obstacle, WNAC bases its conversion claim only on the payments. See [Am Compl. ¶ 6 ("Defendants' wrongful exercise of control over the payments owed to WNAC for the retransmission of the Station's signal in 2017-2019 constitutes conversion.")]; see also [id. ¶¶ 107–12]; [ECF No. 50 at 16–17]. While the Court is not convinced that WNAC's conversion claim for the value of the retransmissions seeks to protect anything more than its copyright claims, the Court need not make such a finding as the conversion claim fails for another fundamental reason. "In order for money to be the subject of a conversion claim, the plaintiff must identify a specific pool or fund in which he or she has a possessory interest." Omori v. Brandeis Univ., 533 F. Supp. 3d 49, 56 (D. Mass. 2021) (citing Wollaston, 2019 WL 6841987, at *2).

> [C]onversion of money occurs only when the money is specifically earmarked, or capable of identification such as money in a bag, coins

12

> or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered.
>
> An action will not lie for the conversion of a mere debt, and where there is only a relationship of a debtor and creditor, not an obligation to return identical money, an action for conversion of the funds representing the indebtedness will not lie against the debtor.

Mukthineni v. Paladugu, No. 16-cv-10989, 2017 WL 2483706, at *6 (D. Mass. June 8, 2017) (citation omitted).  Here, WNAC seeks only the unidentified sum Verizon paid to Nexstar for the retransmissions as opposed to a specific fund in which it has possessory interest.  This cannot support a claim for conversion.  Leness v. Chang, 179 N.E.3d 1134, 2021 WL 5979643, at *2 (Mass. App. Ct. 2021) ("[T]here is a distinction between being entitled to an amount of money and being entitled to particular funds; between the two, only the latter may serve as the basis of a conversion claim.").

    **C.**    **Breach of Contract (Count VI)**

Finally, Defendants move to dismiss WNAC's breach of contract claim, which is pled in the alternative.  WNAC alleges that, to the extent the 2017 Agreement lawfully covered retransmission of the station's signal from 2017 to 2019, WNAC was entitled to compensation as an intended third-party beneficiary, which it never received, and that Defendants' failure to compensate WNAC constituted a breach.  [Am. Compl. ¶¶ 113–17].  Defendants respond that WNAC has not identified a specific provision of the 2017 Agreement that has been breached and does not have standing to enforce the contract because it has not pled facts sufficient to establish that it is an intended beneficiary of the contract.  [ECF No. 45 at 23–24; ECF No. 47 at 25–26].

As a preliminary matter, all parties agree that the 2017 Agreement is governed by New York law.  [ECF No. 45 at 23; ECF No. 49 at 22 n.4].

In order for a plaintiff to successfully state a claim for a breach of contract under New York law as a third-party beneficiary, he must show "(1) the existence of a valid and binding contract between other parties[;] (2) that the contract was intended for his benefit[;] and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." Red Mountain Med. Holdings, Inc. v. Brill, 563 F. Supp. 3d 159, 168 (S.D.N.Y. 2021) (citation omitted). Additionally, as with all breach of contract claims, "a complaint must plead the specific provisions of the contract that were allegedly breached and the specific actions of the defendants that constituted that breach." Anderson v. Greene, 774 F. App'x 694, 697 (2d Cir. 2019) (citation omitted).

Though WNAC elsewhere disputes the validity of the 2017 Agreement between Verizon and Nexstar, for the purposes of this claim, the Agreement is assumed to be valid. [Am. Compl. ¶ 114]. Similarly, it necessarily assumes, for the purposes of this claim only, that WNAC is included in the Agreement's definition of Licensee pursuant to the Agreement's after-acquired provision clause. [Id. ¶ 116; ECF No. 47 at 11, 22–25]. In fact, WNAC's breach of contract theory rests on this assumption: that it is incorporated into the contract as a Licensee, and that the Agreement's language that the "Operator" (Verizon) "will pay [fees] to Nexstar . . . on behalf of the Licensees" is both the provision that was breached and the evidence that Defendants "intended for WNAC to receive an immediate benefit from the Agreement, *i.e.* compensation for retransmission of its signal." [ECF No. 47 at 23–24]. Defendants contend that there is no breach because there is nothing in the plain language of the contract that requires that payments be directly made or remitted to a Licensee. Defendants emphasize the contract provides only that payments be made by Verizon to Nexstar, which all parties agree happened.

14

WNAC's theory is odd, in that it alleges that *both* parties to the contract colluded to deprive a third-party of its benefit, distinguishing it from straightforward cases where a third-party beneficiary's claim is reliant on one party's breach and therefore subject to the same defense available to the other contracting party, *i.e.*, payment or performance.  See Artwear, Inc. v. Hughes, 615 N.Y.S.2d 689 (N.Y. App. Div. 1st Dept. 1994).  At the motion to dismiss stage, the Court finds that WNAC has at least identified a contract provision and a purported act of breach that are sufficient to put Defendants on notice of the claim asserted.  Wolff v. Rare Medium, Inc., 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).

New York law allows a non-party to show that it was the intended direct beneficiary of a contract in one of two ways: "when the third party is the only one who could recover for the breach of contract," (not at issue here) or "when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.'"  Red Mountain Med., 563 F. Supp. 3d at 168–69 (quoting Dormitory Auth. Of the State of N.Y. v. Samson Constr. Co., 30 N.Y.3d 704, 710 (N.Y. 2018) (additional citation omitted)).  "[D]ismissal of a third-party-beneficiary claim is appropriate where the contract rules out any intent to benefit the claimant."  Freepoint Commodities LLC v. Ridgebury Kilo LLC, No. 20-cv-07246, 2022 WL 4619911, at *3 (S.D.N.Y. Sept. 30, 2022) (quoting Subaru Distribs. Corp. v. Subaru of America, 425 F.3d 119, 124 (2d Cir. 2005)).  "In addition to considering the contract itself, courts may look to the surrounding circumstances to determine whether the promisee intended to give the third party the benefit of the promised performance."  Id. (internal quotation marks and alternations omitted).

There appears to be some conflict among New York precedent regarding the scope of the Court's review in determining whether an entity is an intended third-party beneficiary.  See A &

15

E Television Networks, LLC v. Pivot Point Ent., LLC, No. 10-cv-09422, 2013 WL 1245453, at *22 (S.D.N.Y. Mar. 27, 2013) (observing that "[t]here is some dispute under New York law" as to whether a court may look to extrinsic evidence or limit itself only to the face of the contract); In re GlassHouse Techs., Inc., 604 B.R. 600, 622 (Bankr. D. Mass 2019) ("Many courts interpreting New York law do not look beyond the language of the contract . . . . Other courts look beyond the language of the contract in appropriate circumstances"). Time and again, however, New York courts have instructed that "a court 'should consider the circumstances surrounding the transaction as well as the actual language of the contract.'" Dean St. Cap. Advisors, LLC v. Otoka Energy Corp., No. 15-cv-0824, 2016 WL 413124, at *3 (S.D.N.Y. Feb. 1, 2016) (quoting Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 52 (2d Cir. 2012).

Either way, viewing the allegations in the light most favorable to WNAC, the Court concludes that WNAC has adequately alleged some plausible ambiguity as to whether the Agreement's "on behalf of" language, among other parts, intended to confer the benefit of compensation to WNAC. For example, New York courts have consistently held that "an intent to permit enforcement by the third party" may be evinced "by fixing the rate or price at which the third party can obtain services or goods even though there was no duty of the promisee to the third party." Subaru Distribs. Corp. v. Subaru of Am., Inc., No. 03-cv-9608, 2004 WL 3220120, at *10 (S.D.N.Y. June 1, 2004), aff'd sub nom. Subaru Distribs. Corp., 425 F.3d 119, (quoting Fourth Ocean Putnam Corp., 485 N.E.2d 208, 212 (N.Y. 1985)); see also Whitaker v. On the Right Track Sys., Inc., No. 21-cv-0840, 2022 WL 785058, at *7 (S.D.N.Y. Mar. 14, 2022). Though not precisely analogous, the Agreement does fix the rate of fees for the retransmissions of Licensees. [ECF No. 47-1 at 24]. Moreover, the Agreement states that Licensees, including

those after-acquired, "will become part of this Agreement, under the same terms and conditions . . . for the remainder of the Term[.]" [ECF No. 47-1 at 13 § 15]. The language does not exclude the possibility that Licensees had a right to enforce the Agreement. Though "[t]his court need not accept plaintiff's interpretation of the language of the contract . . . on a motion to dismiss it should resolve any ambiguities in his favor." See Verzani v. Costco Wholesale Corp., 641 F.Supp.2d 291, 299 (S.D.N.Y. 2009).[4]

In light of this ambiguity and the complicated regulatory scheme invoked by the contract, the Court, drawing all inferences in WNAC's favor, cannot at this time conclude as a matter of law that WNAC is not an intended third-party beneficiary. Therefore, although a close call, WNAC has stated a claim for breach of contract sufficient to allow the case to move forward at the motion to dismiss stage.

## I. CONCLUSION

For the above reasons, Defendants' motions to dismiss, [ECF Nos. 44, 46], are GRANTED in part and DENIED in part. Specifically, the motions are GRANTED as to Counts IV, V, and VII, and DENIED as to Count VI.

**SO ORDERED.**

December 19, 2022 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

[4] To the extent Defendants argue that the non-assignment clause in the 2017 Agreement is sufficient to bar enforcement by third parties, [ECF No. 47 at 26], that argument is unavailing, see Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 164 (S.D.N.Y. 1998) (holding that the existence of a non-assignment clause alone does not suffice to preclude assertion of intended third-party beneficiary status); cf. In re GlassHouse Techs., Inc., 604 B.R. at 623 (party is not precluded from asserting third-party beneficiary status where contract does not contain a clause that explicitly permits or prohibits enforcement by non-parties).