UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WNAC, LLC, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-10750-ADB |
| VERIZON CORPORATE SERVICES GROUP, INC. and NEXSTAR MEDIA GROUP, INC., | * | |
| | * | |
| Defendants. | * | |

# MEMORANDUM AND ORDER

BURROUGHS, D.J.

    Plaintiff WNAC, LLC ("WNAC") brought this action against Verizon Corporate Services Group, Inc. ("Verizon") and Nexstar Media Group, Inc. ("Nexstar") (collectively, "Defendants"), alleging that Defendants conspired to wrongfully retransmit the signal from WNAC's television broadcast station, WNAC-TV, in violation of the Copyright Act, and also asserting various state law claims.  See [ECF No. 84 ("Second Amended Complaint")].  Verizon, in turn, counterclaims alleging that WNAC violated Massachusetts General Law Chapter 93A ("Chapter 93A") by breaching the duty to negotiate in good faith imposed by the Federal Communication Commission ("FCC") rules relating to retransmission consent negotiations.  See [ECF No. 88 ("Counterclaim Complaint" or "CC")].  Currently before the Court is WNAC's motion to dismiss Verizon's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6).  [ECF No. 89].  For the following reasons, the motion is DENIED.

1

I.  **BACKGROUND**

    A.  **Statutory and Regulatory Background**

Pursuant to 47 U.S.C. § 325 (the "Act"),

> [n]o . . . multichannel video programming distributor shall retransmit the signal of a broadcasting station, or any part thereof, except
>
> > (A) with the express authority of the originating station;
> > (B) under section 534 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section; or
> > (C) under section 338 of this title, in the case of a station electing, in accordance with this subsection, to assert the right to carriage under such section.

Id. § 325(b)(1). "[T]elevision stations . . . every three years . . . , [must] make an election between the right to grant retransmission consent under this subsection and the right to signal carriage under section 534 of this title." Id. § 325(b)(3)(B). Verizon is a multichannel video programming distributor ("MVPD") and WNAC is a broadcasting station within the meaning of § 325. [CC ¶¶ 1, 19].

Pursuant to its statutory rule-making authority under the Act, see 47 U.S.C. § 325(b)(3), the Federal Communication Commission ("FCC") promulgated rules ("FCC Rules") that mandate that "[t]elevision broadcast stations and [MVPDs] shall negotiate in good faith the terms and conditions of retransmission consent agreements," 47 C.F.R. § 76.65(a).

    B.  **Factual Background**

The following facts are taken from Verizon's Counterclaim Complaint and assumed to be true. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

Prior to January 2017, Verizon retransmitted WNAC's broadcast signal in the Providence, Rhode Island–New Bedford, Massachusetts market ("Providence–New Bedford Market") through a February 6, 2015 retransmission-consent agreement between Verizon and

2

LIN Television Corporation ("LIN") ("February 2015 LIN Retransmission-Consent Agreement"). [CC ¶¶ 9, 11]. Prior to 2017, LIN was authorized, as WNAC's local marketing agent, to negotiate retransmission consent on WNAC's behalf. [Id.]. In exchange for the right to retransmit WNAC's signal, Verizon paid fees to LIN, a portion of which LIN "presumably passed along" to WNAC. [Id.]. The February 2015 LIN Retransmission-Consent Agreement provided that it would remain in place through August 5, 2017, unless the parties opted to terminate it. [Id. ¶ 10]. In early 2015, LIN merged with Media General, Inc. [Id.]. The merged entity, also named Media General, Inc. ("Media General"), succeeded to the February 2015 Retransmission Agreement. [Id.].

On December 30, 2016, Nexstar entered into a retransmission-consent agreement with Verizon for the term January 1, 2017 to December 31, 2019 ("December 2016 Nexstar Retransmission-Consent Agreement"). [CC ¶ 12]. On January 13, 2017, Nexstar informed Verizon that, effective on or around January 17, 2017, it was merging with and acquiring Media General. [Id. ¶ 13]. Pursuant to the December 2016 Nexstar Retransmission-Consent Agreement's "after-acquired" provision, in the event that two conflicting retransmission-consent agreements could apply to the same station, the December 2016 Nexstar Retransmission-Consent Agreement "would govern 'any additional television broadcast station' of which 'Nexstar becomes the direct or indirect owner, operator, licensee, programmer, or manager.'" [Id. ¶ 14].

After Nexstar's January 2017 acquisition of Media General, Verizon continued to retransmit WNAC's signal in the Providence–New Bedford Market, but stopped paying fees to Medial General, pursuant to the February 2015 LIN Retransmission-Consent Agreement. [CC ¶ 15]. Instead, Verizon began paying fees to Nexstar for WNAC's signal, and continued to do so through December 2019, the end of the term for the December 2016 Nexstar Retransmission-

Consent Agreement. [Id.]. "At all times, Verizon believed in good faith that [the December 2016 Nexstar Retransmission-Consent Agreement] . . . properly authorized its retransmission of WNAC's signal from 2017 to 2019." [Id. ¶ 16].

In or around November 2019, Verizon commenced direct negotiations with WNAC to obtain retransmission consent for 2020 through 2022. [CC ¶ 17]. In December 2019, Verizon and WNAC reached an agreement, through which WNAC consented to Verizon retransmitting WNAC's signal in the Providence–New Bedford Market for the term January 1, 2020 to December 15, 2022. [Id.].

"At all times, Verizon had a significant number of subscribers in the [Providence–New Bedford Market] . . . to whom it retransmitted WNAC's signal." [CC ¶¶ 11, 23].[1] Likewise, "WNAC was benefiting from [Verizon's] retransmission [of its signal] by leveraging higher advertising fees based on the station's distribution on Verizon's system." [Id. ¶ 24]. Verizon asserts that WNAC "knew throughout the 2017–2019 cycle [and through Verizon and WNAC's negotiations in late 2019] that Verizon was retransmitting [WNAC's] signal." [Id. ¶¶ 23–24]. Verizon further avers that "WNAC [also] knew that Nexstar acquired Media General in January 2017 and succeeded to its role as programmer for the WNAC station." [Id. ¶ 22].

Finally, Verizon asserts that if, in 2017–2019, "WNAC believed – as it now alleges – that Nexstar was not authorized to negotiate with or grant consent to Verizon on WNAC's behalf in 2017–2019, FCC rules required it to commence retransmission-consent negotiations with Verizon on its own," as well as to "designate[] a representative to negotiate with Verizon who

---

[1] At the time of the February 2015 LIN Retransmission-Consent Agreement, Verizon had nearly 150,000 subscribers in the Providence–New Bedford Market and had transmitted WNAC's signal for years before that. [CC ¶¶ 11, 23].

4

was authorized to make binding representations on its behalf." [CC ¶ 25]. Verizon states that WNAC did neither. [Id.].

### C. Procedural Background

WNAC filed its original complaint on May 6, 2021, [ECF No. 1], and an amended complaint on February 10, 2022, [ECF No. 40]. After the Court granted in part and denied in part Defendants' motions to dismiss WNAC's state law claims, [ECF No. 60], Verizon filed its answer and counterclaim to WNAC's first amended complaint on January 24, 2023, [ECF No. 69]. WNAC then filed the Second Amended Complaint on March 2, 2023. [Second Amended Complaint]. In turn, Verizon filed its Answer and Counterclaim to WNAC's Second Amended Complaint on March 16, 2023. [CC].

On March 24, 2023, WNAC moved to dismiss Verizon's counterclaim, which Verizon opposed on April 24, 2023. [ECF Nos. 89, 97].

## II. LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff. See Gilbert v. City of Chicopee, 915 F.3d 74, 76, 80 (1st Cir. 2019). "[D]etailed factual allegations" are not required, but the counterclaim must set forth "more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Id. at 570. "To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d

77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the [counterclaim's] factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

### III.    DISCUSSION

Verizon alleges that despite WNAC's knowledge that Verizon was retransmitting its signal while paying elevated rates to Nexstar, and WNAC's "stated belief that Verizon lacked consent to retransmit [that] signal, WNAC failed to engage in negotiations with Verizon for its consent to retransmit." [CC ¶ 37]. Additionally, according to Verizon, "WNAC did not designate an authorized representative to negotiate on its behalf; did not approach Verizon about a retransmission-content agreement; and did not ever suggest that Nexstar lacked authority to collect retransmission-consent fees on its behalf." [Id.]. Verizon asserts that through these inactions or omissions, WNAC violated the FCC Rules, or at least the spirit of the Rules, and therefore engaged in unfair and/or deceptive acts or practices within the meaning of Chapter 93A. [Id. ¶ 38]. Verizon further alleges that WNAC's conduct caused Verizon a "loss of money or property," by "necessitating Verizon's defense of its interests in this litigation, entailing significant litigation costs, including but not limited to its attorneys' fees, and by causing the inflated retransmission-consent fees that Verizon ultimately paid to Nexstar from 2017-2019." [Id. ¶ 41].

> [Massachusetts] General Laws c. 93A, § 11, states, in relevant part: "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition

or an unfair or deceptive act or practice . . . may . . . bring an action in the superior court . . . for damages and such equitable relief . . . as the court deems to be necessary and proper."

Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 258–59 (Mass. 2008) (quoting Mass. Gen. Laws c. 93A, § 11). "To be successful, a plaintiff bringing a claim under § 11 must establish (1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by G.L. c. 93A, § 2, or the regulations promulgated thereunder; (2) a loss of money or property suffered as a result; and (3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice." Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066, 1074–75 (Mass. 2014).

WNAC asserts that its conduct, or inaction, was neither unfair nor deceptive, although its arguments in its opening brief focus exclusively on unfairness. [ECF No. 90 at 15–23]. Specifically, it argues that its conduct was not unfair because the FCC Rules impose no duty on WNAC to initiate negotiations with Verizon, and, "it is not within 'the penumbra of some established concept of unfairness' for a commercial party to wait until a business relationship ends before asserting its legal rights in court." [Id. at 15–20 (quoting Zurich Am. Ins. Co. v. Watts Regulator Co., 796 F. Supp. 2d 240, 244 (D. Mass. 2011))]. Additionally, WNAC asserts that it never refused to negotiate or appoint an authorized representative, and in fact, it sent letters to Verizon and other MVPDs informing them of its retransmission consent election and identifying a point of contact for negotiations. [Id. at 20–23]. WNAC requests that the Court take judicial notice of these letters. [Id. at 21–23].

In opposition, Verizon responds that WNAC offers a cramped reading of the FCC Rules, and even if WNAC has not actually violated the regulations, it violated their spirit. [ECF No. 97 at 11–21]. Verizon asserts that the Rules "embody" "unfairness principles" because the FCC Rules were "promulgated . . . to ensure that negotiations over retransmission consent 'are

conducted in an atmosphere of honesty, purpose and clarity of process,'" and "impos[es] on broadcasters a general '[d]uty to negotiate in good faith.'" [Id. at 12–13 (first citing PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975); then citing Implementation of the Satellite Home Viewer Improvement Act of 1999: Retransmission Consent Issues, First Report and Order, 15 FCC Rcd 5445 ¶ 24 (2000) ("Good Faith Order"), recon. granted in part, 16 FCC Rcd 15599 (2001); and then citing 47 C.F.R. § 76.65(a), (b)(1))]. As such, WNAC's conduct falls "'within at least the penumbra,' of th[ose] unfairness principles." [Id. at 13]. Finally, according to Verizon, several of WNAC's arguments, including those related to WNAC's alleged failure to designate a negotiation representative, contest Verizon's factual allegations, which is inappropriate on a motion to dismiss. [Id. at 21–22].

"Chapter 93A does not define what constitutes an 'unfair or deceptive act or practice.'" Kattar v. Demoulas, 739 N.E.2d 246, 257 (Mass. 2000) (citation omitted). Instead, "Chapter 93A liability is decided case-by-case, and Massachusetts courts have consistently emphasized the 'fact-specific nature of the inquiry.'" Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (quoting Linkage Corp. v. Trustees of Bos. Univ., 679 N.E.2d 191, 209 (Mass. 1997)). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact, the boundaries of what may qualify for consideration as a [Chapter] 93A violation is a question of law." Id. at 54 (quoting Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996)). "Chapter 93A 'is a statute of broad impact.'" Anoush Cab, Inc. v. Uber Techs., Inc., 8 F.4th 1, 15 (1st Cir. 2021) (quoting Exxon Mobil Corp. v. Att'y Gen., 94 N.E.3d 786, 791 (Mass. 2018)). "The courts are not invited by the statute to punish every departure from 'the punctilio of an honor the most sensitive,' but they may enforce standards of behavior measurably higher

8

than perfidy." Anoush Cab, 8 F.4th at 17 (quoting Doliner v. Brown, 489 N.E.2d 1036, 1040 (Mass. App. Ct. 1986)).

> To determine what conduct rises to the level of an "unfair" act or practice actionable under G. L. c. 93A, [the Supreme Judicial Court ('SJC')] ha[s] consistently looked to the factors articulated in [PMP Assocs., 321 N.E.2d at 917]: (1) whether the conduct is within "at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers" or other businesses.

H1 Lincoln, Inc. v. S. Washington St., LLC, 179 N.E.3d 545, 557 (Mass. 2022). "For [a] practice to fall within the penumbra of a statute's concept of unfairness, it need not actually violate the statute." Cooper v. Charter Commc'ns Ents. I, LLC, 760 F.3d 103, 111 (1st Cir. 2014) (quoting Kattar, 739 N.E.2d at 257). "[I]t is neither necessary nor sufficient that a particular act or practice violate common or statutory law." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009) (citing Kattar, 739 N.E.2d at 257; Renovators Supply Inc. v. Sovereign Bank, 892 N.E.2d 777, 787 (Mass. App. Ct. 2008)), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009). Instead, Massachusetts courts "focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. c. 93A fairness determination." Com. Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000) (quoting Mass. Emps. Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995)).

The Court finds that Verizon has adequately alleged that WNAC engaged in unfair acts or practices. As noted above, the FCC Rules' plain language imposes a duty on TV broadcast stations, like WNAC, to "negotiate in good faith the terms and conditions of retransmission consent agreements." 47 C.F.R. § 76.65(a). In announcing the FCC Rules, the FCC explained its understanding that "by imposing the good faith obligation, Congress intended that the

9

Commission develop and enforce a process that ensures that broadcasters and MVPDs meet to negotiate retransmission consent and that such negotiations are conducted in an atmosphere of honesty, purpose and clarity of process." Good Faith Order ¶ 24. The FCC Rules adopt a "two-part test for [evaluating] good faith" in this context. See id. ¶ 6. The first part of the test considers whether a party has engaged in any of several specifically identified actions, id., including:

> (i) Refusal by a Negotiating Entity to negotiate retransmission consent;
> (ii) Refusal by a Negotiating Entity to designate a representative with authority to make binding representations on retransmission consent; [and]
> (iii) Refusal by a Negotiating Entity to meet and negotiate retransmission consent at reasonable times and locations, or acting in a manner that unreasonably delays retransmission consent negotiations[.]

47 C.F.R. § 76.65(b)(1)(i)–(iii). "The second part of the good faith test is based on a totality of the circumstances standard." Good Faith Order ¶ 7; see 47 C.F.R. § 76.65(b)(4). Pursuant to the "broader, totality of the circumstances test," Good Faith Order ¶ 30, "[parties] may present facts to the Commission which, even though they do not allege a violation of the objective standards, given the totality of the circumstances reflect an absence of a sincere desire to reach an agreement that is acceptable to both parties and thus constitute a failure to negotiate in good faith," id. ¶ 32; see 47 CFR § 76.65(b)(4).

A breach of a duty of good faith may serve as the basis for a Chapter 93A claim. See Lycos, Inc. v. Internet Venture Works, Inc., No. 02-cv-11383, 2003 WL 21146661, at *2 (D. Mass. May 19, 2003) (denying motion to dismiss Chapter 93A based on alleged breach of a duty to negotiate in good faith that was imposed by a settlement agreement); see also Martorana v. Progressive Direct Ins. Co., No. 22-cv-10613, 2023 WL 2465639, at *7 (D. Mass. Mar. 10, 2023) (declining to dismiss a Chapter 93A claim premised in part on conduct breaching the implied covenant of good faith and fair dealing, because such conduct "comes 'within a[]

10

recognized or established common law . . . concept of fairness'" (second alteration in original) (quoting VMark Software v. EMC Corp., 642 N.E.2d 587, 595 (Mass. App. Ct. 1994))). The Court likewise finds that where the Rules explicitly identify "[r]efusal by a Negotiating Entity to designate a representative with authority to make binding representations on retransmission consent" as a violation of the Rules' duty of good faith, a failure to identify a point of contact for negotiations could constitute unfair conduct within the meaning of Chapter 93A. 47 C.F.R. § 76.65(b)(1)(ii).

WNAC argues that it did designate a negotiation representative, pointing to letters it asserts it sent to Verizon and other MVPDs and posted to the FCC's publicly available website, and that the Court may take judicial notice of these letters when considering the motion to dismiss. [ECF No. 90 at 21–22]. These letters state, for example:

> [WNAC] hereby notifies you that pursuant to Section 325(b) of the Communications Act of 1934, as amended, and Section 76.64(f) of the FCC's Rules, [WNAC] elects to assert its right, under Section 76.64(a) of the FCC's rules, to have the broadcast signal of [WNAC] carried on your multichannel video programming distribution service in our 'television market[.]' . . . This retransmission consent election is for the [relevant] period.

[ECF No. 91-2 at 7 (letter dated September 23, 2017 and addressed to "Verizon Corporate Services Group, Inc," relevant to period "January 1, 2018 through December 31, 2020")]. They add: "Please direct any correspondence concerning this election statement to me [President Timothy G. Sheehan] at the address provided below." [Id.]. Verizon does not contest that the Court may take judicial notice of the existence of these letters, but argues that their "legal effect," that is whether these letters satisfied WNAC's obligation under the FCC Rules to designate a negotiation representative, is disputed, and thus not an appropriate subject for judicial notice. [ECF No. 97 at 22–24]. The Court agrees. Cf. Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking "judicial notice of the relevant facts provided on the

11

[Center for Disease Control's] website, . . . 'not subject to reasonable dispute.'" (citing Fed. R. Evid. 201(b), (f); Denius v. Dunlap, 330 F.3d 919, 926–27 (7th Cir. 2003))).  At this early stage of the litigation, the Court declines to adopt WNAC's reading of these letters, and instead credits Verizon's allegation that WNAC failed to designate a representative, which may qualify as unfair conduct.

Likewise, given the Rules' broad test for good faith, see July 27, 2016 FCC Letter from Chairman Tom Wheeler to Representative Bob Gibbs, 2016 WL 4371564, at *1 (July 27, 2016) ("[O]ur current totality of the circumstances test . . . is intentionally broad"), the Court finds that not disclosing information and not commencing negotiations, could, depending on the surrounding facts, show "an absence of a sincere desire to reach an agreement that is acceptable to both parties and thus constitute a failure to negotiate in good faith," Good Faith Order ¶ 32. Even if the Rules are more focused on practices within negotiations rather than practices prior to negotiations, as WNAC asserts, at least one of the per se violations of the Rules' duty of good faith relates to a pre-negotiation practice, that is, refusing to designate a negotiation representative.  It therefore seems that WNAC's alleged practices fall within at least a penumbra of the FCC Rules' concept of unfairness.

The Court declines to address WNAC's arguments concerning deceptive acts or practices, which it only raised in its reply brief.  See [ECF No. 104].  "The purpose of a reply memorandum is not to file new arguments that could have been raised in a supporting memorandum." Noonan v. Wonderland Greyhound Park Realty LLC, 723 F. Supp. 2d 298, 349 (D. Mass. 2010).  "Where, as here, a moving party raises an argument for the first time in a reply brief, that argument is waived." Napert v. Gov't Emps. Ins. Co., No. 13-cv-10530, 2013 WL 3989645, at *2 n.4 (D. Mass. Aug. 1, 2013); see also Wills v. Brown Univ., 184 F.3d 20, 27 (1st

Cir. 1999) ("[T]heories offered for the first time in the reply brief are not preserved." (emphasis omitted)). WNAC may re-raise its arguments in future motions, but for purposes of the instant motion to dismiss, they are waived. The Court finds that Verizon has, at this early stage of the litigation, adequately pleaded potentially deceptive conduct. For the same reason, the Court finds Verizon has sufficiently alleged injury and causation. Again, WNAC may raise arguments included in its reply brief in future motions, but for now they are deemed waived.

## IV.      CONCLUSION

For the above reasons, WNAC's motion to dismiss, [ECF No. 89], is <u>DENIED</u>.

**SO ORDERED.**

February 26, 2024                                                        /s/ Allison D. Burroughs
                                                                                         ALLISON D. BURROUGHS
                                                                                         U.S. DISTRICT JUDGE